JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GUCCIONE COLLECTION, LLC,

                         Plaintiff,

       - against -

MICHAEL LINDA, as personal representative of
the Estate Of Robert Guccione, Sr.,

                       Defendant.
-------------------------------------------------------------:X

13 CV 6949

Civil Action No.

RECEIVED
OCT 0 1 2013
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

    Plaintiff Guccione Collection, LLC ("GC"), by and through its attorneys, Friedman &

Wittenstein, A Professional Corporation, alleges as follows for its Complaint:

### NATURE OF THE ACTION

    1.     In this action, plaintiff seeks (i) a declaration that it is the rightful owner of all

rights associated with certain artwork and other items formerly belonging to Bob Guccione, the

now-deceased former owner and publisher of Penthouse Magazine ("Penthouse"); (ii) a

declaration that its ownership, use, and sale of those items do not infringe any intellectual

property rights belonging to the defendant, the Estate of Robert Guccione, Sr. (the "Estate"); and

(iii) damages for the Estate's wrongful interference with the current and prospective economic

relations of GC.

    2.     As explained more fully below, GC has purchased from third parties numerous

valuable artistic and historically significant items created or owned by Mr. Guccione during his

lifetime.  These third parties had acquired the items either pursuant to Mr. Guccione's personal

bankruptcy or through liens placed on Mr. Guccione's assets.  GC maintains a website that

discusses the life of Mr. Guccione and that offers for sale many of the items that GC has acquired as the "Guccione Collection."

3.     Although GC unquestionably owns title to all of the assets that comprise the Guccione Collection, and although none of these assets was ever part of the Estate, the Estate has engaged in a course of conduct, including a letter-writing campaign, in which it makes false and unsubstantiated claims about its alleged rights to the items comprising the Guccione Collection, and accuses business partners of GC of violating various intellectual and other property rights of the Estate.

**PARTIES**

4.     GC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in New Jersey.  The members of GC are Jerrick Ventures LLC ("Jerrick") and JAJ Investment Holdings LLC ("JAJ").  The members of Jerrick are Jeremy Frommer and Rick Schwartz, both of whom are citizens of the State of New Jersey.  The members of JAJ are Jerrick, as well as Arline Schwechter, Jason Luogameno, and Jeremy Frommer, each of whom is a citizen of the State of New Jersey.

5.     Upon information and belief, the personal representative of the Estate is a citizen of the State of New Jersey, but the Estate is a citizen of the State of Texas.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, in that it arises under the copyright and trademark laws of the United States. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 2201, in that it seeks a declaratory judgment and there is a real and substantial controversy between parties with adverse legal interests.

7.      In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

8.      This Court has personal jurisdiction over the defendant, in that defendant committed a tort within the State and County of New York.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions that give rise to this action occurred in this District.

## FACTS

10.      Bob Guccione ("Guccione") was best known as the founder, owner, and publisher of Penthouse, but he was also an accomplished artist, photographer, filmmaker, and writer. During the course of his lifetime, he created many valuable works of art, including oil paintings, sketches, and photographs.

11.      Although at one point in his life Guccione was very wealthy, after a series of bad investments, and the decline and ultimate bankruptcy of Penthouse and its parent corporation, Mr. Guccione was forced to declare personal bankruptcy in 2008.  As a result of the bankruptcy process and Guccione's financial problems, many of the valuable works of art, sketches, and photographs that had once belonged to him ended up in the hands of his creditors.  Thereafter, GC acquired many of those works from Guccione's creditors.

**Dwarfco Contract**

12.      On February 2, 1999, Guccione entered into a contract with Dwarfco Productions (the "Dwarfco Contract"), in which he agreed to sell to Dwarfco all of the original oil paintings and drawings that he had created up until that time (the "Dwarfco Art"), in exchange for "precious and semi-precious cut and polished gemstones" that had been appraised at more than

3

$1,000,000.  Although, pursuant to the Dwarfco Contract, Dwarfco took immediate title to the artwork, the artwork actually remained in Guccione's possession.

13.     The Dwarfco Contract also provided that while Guccione preserved all reproduction rights, including the right to pursue statutory copyrights during his life, upon his death "all reproduction rights [would be] automatically transferred to Dwarfco."  (A copy of the Dwarfco Contract is attached hereto as Exhibit A).  Thus, even if the rights to the Dwarfco Art had not been transferred to Guccione's creditors as part of Guccione's personal bankruptcy (as set forth below), the Estate could not have inherited those rights upon Guccione's death in October 2010, because Guccione had sold them in 1999 as part of the Dwarfco Contract.

**Sell Acquires Some of Guccione's Personal Property**

14.     In or about 2005, James C. Sell ("Sell"), as the receiver for Secura Mortgage Management, obtained a judgment against Guccione in Arizona for approximately $33,000,000 (the "Secura Judgment").

15.     In or about 2006, in connection with the bankruptcy proceedings of Penthouse's parent company, General Media, Inc., Guccione was evicted from his residence in Manhattan. At that time, he placed many of his remaining personal items into storage facilities in New York and New Jersey.  Among the items placed into those facilities were the Dwarfco Artwork, as well as numerous other writings, photographs, and artifacts from Guccione's life.

16.     In 2006 and 2007, Sell domesticated the Secura Judgment in New York and New Jersey.  In May 2007, the Sheriff of Hudson County New Jersey ("Hudson Sherriff") levied the Secura Judgment against the contents of a storage facility in Jersey City, New Jersey (the "Jersey City Storage Facility"), which contained many personal items of Mr. Guccione, including, but not limited to, the Dwarfco Artwork.

17.     On or about June 26, 2008, the Hudson Sherriff conducted a sale of the assets it had levied, which Sell, on behalf of Secura, won by bidding the amount of its judgment, plus $100.  At this point, Sell acquired the entire contents of the Jersey City Storage Facility.

18.     In or about August 2008, Guccione filed for personal bankruptcy and in September of that year he instituted an adversarial proceeding against Sell, claiming that the levy against his personal property in the Jersey City Storage Facility was conducted improperly and did not comply with New Jersey law.

19.     In or about November 2009, the parties to the various adversary proceedings in the Guccione bankruptcy entered into a global settlement.  That settlement granted ownership to Sell of all items (except personal items that did not have "extraordinary value") in certain specific storage facilities, including the Jersey City Storage Facility.  Accordingly, Sell became the owner of photographs, writings, and numerous other artifacts that had previously belonged to Guccione.  (A true and correct copy of the Settlement Agreement is attached hereto as Exhibit B).

20.     The settlement also provided that if Dwarfco failed to pay Sell for a portion of the storage fees he had incurred in connection with the Dwarfco Art, title to the Dwarfco Art would pass to Sell "free and clear of any and all liens, claims, and encumbrances, including but not limited to any claims by Dwarfco."

21.     Upon information and belief, Dwarfco did not pay Sell for its portion of the storage fees, and title to the Dwarfco Art passed to Sell.

22.     As a result of the bankruptcy process described above, and by operation of law, Sell (on behalf of Secura) became the owner of the rights to much of the personal property of

Guccione that was subject to the bankruptcy, including, but not limited to, the Jersey City

Storage Facility.  This included the Dwarfco Art.

**GC Acquires the "Guccione Collection"**

23.    In or about February 2012, Jeremy Frommer – one of the principals in the parent

company of GC – purchased at auction the contents of a storage facility in Englewood, New

Jersey, that had previously belonged to Mr. Guccione.  Included in this storage facility were

numerous examples of the erotic photography for which Mr. Guccione was famous, as well as

films, magazines, artworks and documents of historical significance.

24.    Subsequently, Mr. Frommer, through the use of the information available in the

assets he purchased in February 2012, as well as other resources, was able to locate Sell.  In

November 2012, Mr. Frommer purchased all of the items and all of the rights to the items that

had come into possession of Sell as a result of the Secura Judgment.  Thereafter, Mr. Frommer

assigned all of the property that he had purchased to a newly formed entity – Guccione

Collection LLC, the plaintiff here – and began offering those items for sale, as the "Guccione

Collection."

25.    Much of the Guccione Collection, including oil paintings, sketches, and

photography, is offered for sale on the Guccione Collection website.  Other artwork owned by

the Guccione Collection is to be auctioned by Christie's later this year.  The artwork created by

Guccione is extremely valuable, and single pieces of the art will be offered for sale at many

thousands of dollars.

26.    In order to publicize the Guccione Collection and maximize its value, GC has

undertaken a major publicity and marketing campaign.

**License to Vice Magazine**

27.     As part of its publicity and marketing campaign, in or about August 2013, GC entered into a license agreement with Vice Magazine ("Vice"), pursuant to which Vice agreed to feature the Guccione Collection in its magazine.  As part of this agreement, Vice agreed to pay a licensing fee, and GC agreed to indemnify Vice against any claims brought by third parties alleging invasion of privacy, false light, or copyright or trademark infringement.

28.     The September 2013 issue of Vice was dedicated to the life of Guccione as shown through the Guccione Collection.  Among other things, it featured the artwork of Guccione, the letters and correspondence of Guccione, samples of the erotic photography of Guccione, manuscript pages from the autobiography of Guccione containing original illustrations, and art work that appeared in Omni Magazine.

**Omni Magazine/Powerhouse Books**

29.     Omni Magazine was a magazine that, upon information and belief, was founded by Guccione in the late 1970s and published by Penthouse's parent company until sometime in the 1990s.  Omni published articles about science and science fiction, and featured futuristic artwork accompanying the articles.

30.     The Guccione Collection includes numerous examples of the artwork from Omni. GC is commercializing that artwork by publishing a book later this year that will contain numerous examples the Omni artwork.  powerHouse [sic] Books ("Powerhouse") will be the publisher of that book (the "Powerhouse Book").

31.     None of the artwork featured in the Powerhouse Book was created by Guccione. Indeed, upon information and belief, Guccione did not create any of the artwork used in Omni. Further, upon information and belief, it was the policy of Omni to accept a non-exclusive license

for the artwork that appeared in Omni, meaning that the copyright for that work remained with the artist. Thus, upon and belief, at no time did Guccione own any rights to the artwork that appeared in Omni, and Guccione certainly did not own any rights to the artwork that will be published in the Powerhouse Book.

**Cease and Desist Letters**

32.    Beginning in September of this year, the Estate launched a letter-writing campaign that was designed to interfere with GC's business opportunities. First, on September 11, 2013, the Estate sent a "cease and desist" letter to GC (the "GC Cease and Desist Letter"). (A true and correct copy of the GC Cease and Desist Letter is attached hereto as Exhibit C).

33.    The GC Cease and Desist Letter asserts that GC cannot reproduce any of the items in its possession because the copyrights to those items are "owned by others, including the Guccione Estate." In addition, the GC Cease and Desist Letter accuses GC of violating trademark rights that it insists are the property of the Estate, of violating the Estate's "right of publicity and other state and federal protectable rights in the Guccione name and likeness," and of "denigrating and demeaning the good name and character of Mr. Guccione."

34.    The GC Cease and Desist Letter also demands a "full and accurate accounting of all items sold by" GC in order to determine whether "a deal can be negotiated, or whether this matter can only be resolved through litigation."

35.    Second, on Wednesday, September 25, 2013, the Estate sent a "cease and desist" letter to Vice (the "Vice Cease and Desist Letter"). (A true and correct copy of the Vice Cease and Desist Letter is attached hereto as Exhibit D).

36.    The Vice Cease and Desist Letter, claiming that there has been "blatant and egregious infringement," demands that Vice "immediately cease and desist from any further

display or publication of the Vice Guccione Material, including but not limited to all writings, photographs, paintings and other content created by Mr. Guccione." Further, the Vice Cease and Desist Letter claims that Vice's use of the Guccione Collection "contains troubling violations of the right of publicity of Mr. Guccione owned by the Estate."

37.     The Vice Cease and Desist Letter demands that Vice confirm by not later than Monday, September 30, 2013, that Vice will comply with all of the Estate's demands, and concludes that if Vice does not so comply, then the Estate will "assume that [Vice] intend[s] to continue willful infringing activity and do[es] not wish to amicably resolve this dispute."

38.     As a result of the Vice Cease and Desist Letter, Vice has informed GC that it intends to remove all Guccione Collection material from its website by Wednesday, October 2, 2013.

39.     Finally, on September 25, 2013, the Estate sent a "cease and desist" letter to Powerhouse (the "Powerhouse Cease and Desist Letter"). (A true and correct copy of the Powerhouse Cease and Desist Letter is attached hereto as Exhibit E). The Powerhouse Cease and Desist Letter asserts that the "Estate owns the copyrights to th[e] artwork and photography" published in Omni and that "reproduction of these materials without permission of the Guccione Estate may be prohibited by copyright laws and may subject [Powerhouse] to damages and injunctive relief." The Powerhouse Cease and Desist Letter concluded by stating that "[i]f [Powerhouse] proceeds with the publication of infringing material, the . . . Estate reserves all rights to pursue its claims at law and in equity with no further notice."

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment of Ownership)

40.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 39 above as if fully set forth herein.

9

41.     By operation of law or otherwise, GC acquired all of the rights in and title to the artwork and other items that comprise the Guccione Collection.

42.     Defendant claims that it owns those rights and title.

43.     There is a real and substantial controversy between parties with adverse legal interests.

44.     Plaintiff is entitled to a declaratory judgment holding that it is the owner of all of the rights in and title to the artwork and other items that comprise the Guccione Collection.

### SECOND CLAIM FOR RELIEF
### (Declaratory Judgment of No Infringement)

45.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 44 above as if fully set forth herein.

46.     Defendant claims that plaintiff is currently infringing valid intellectual property rights belonging to it.

47.     Plaintiff is not infringing any valid intellectual property rights belonging to defendant or any such infringement is excused by an available defense.

48.     There is a real and substantial controversy between parties with adverse legal interests.

49.     Plaintiff is entitled to a declaratory judgment holding that it is not infringing any valid intellectual property rights belonging to defendant.

### THIRD CLAIM FOR RELIEF
### (Declaratory Judgment of No Violation of State Law Rights)

50.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 49 above as if fully set forth herein.

51.     Defendant claims that plaintiff has violated defendant's rights under state law, including its right of publicity, its right not to be shown in a false light, and other state law rights.

52.     Plaintiff has not violated any of defendant's rights under state law or any such violation is excused by an available defense.

53.     There is a real and substantial controversy between parties with adverse legal interests.

54.     Plaintiff is entitled to a declaratory judgment holding that it is not violating any of defendant's rights under state law.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference with Contract – Vice)

55.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 54 above as if fully set forth herein.

56.     Plaintiff has a valid contract with Vice, pursuant to which Vice displayed portions of the Guccione Collection on its website, that provided valuable publicity for GC and helped to increase the sales of the Guccione Collection.

57.     Defendant knew that plaintiff has such a contract.

58.     Defendant intentionally interfered with Vice's performance under that contract, by falsely claiming that Vice has infringed defendant's intellectual property and accusing Vice of violating the rights of defendant existing under state law.

59.     As a result of defendant's interference, Vice has announced its intention to take down all reference to and display of the Guccione Collection from its website.

60.     Plaintiff was damaged and will continue to be damaged by defendant's tortious interference.

## FIFTH CLAIM FOR RELIEF
### (Tortious Interference with a Business Relationship – Vice)

61.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 60 above as if fully set forth herein.

62.     Plaintiff had a business relationship with Vice pursuant to which Vice was displaying portions of the Guccione Collection on its website, which provided valuable publicity for GC and helped to increase the sales of the Guccione Collection.

63.     Defendant knew that plaintiff had such a business relationship.

64.     Defendant, upon information and belief, acting solely out of malice, or using dishonest, unfair, and improper means, intentionally interfered with plaintiff's business relationship with Vice by falsely claiming that Vice had infringed defendant's intellectual property and accusing Vice of violating the rights of defendant existing under state law.

65.     As a result of defendant's interference, Vice has announced its intention to take down all reference to and display of the Guccione Collection from its website, and the relationship between Vice and GC has been irreparably damaged.

66.     Plaintiff was damaged and will continue to be damaged by defendant's tortious interference.

## SIXTH CLAIM FOR RELIEF
### (Tortious Interference with Contract – Powerhouse)

67.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 66 above as if fully set forth herein.

68.     Plaintiff has a valid contract with Powerhouse, pursuant to which Powerhouse will publish a book featuring artwork owned by GC.

69.     Defendant knew that plaintiff has such a contract.

12

70.     Defendant intentionally interfered with Powerhouse's performance under that contract, by falsely claiming that Powerhouse had infringed defendant's intellectual property.

71.     Plaintiff was damaged by defendant's tortious interference.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Interference with a Business Relationship – Powerhouse)

72.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 71 above as if fully set forth herein.

73.     Plaintiff has a business relationship with Powerhouse pursuant to which Powerhouse will publish a book featuring artwork owned by GC.

74.     Defendant knew that plaintiff has such a business relationship.

75.     Defendant, upon information and belief, acting solely out of malice, or using dishonest, unfair, and improper means, intentionally interfered with plaintiff's business relationship with Powerhouse by falsely claiming that Powerhouse had infringed defendant's intellectual property.

76.     Plaintiff was damaged by defendant's tortious interference.

**WHEREFORE**, plaintiff demands judgment as follows:

(a)     on the First Claim for relief, declaring that plaintiff is the owner of all of the rights in and title to the artwork and other items that comprise the Guccione Collection;

(b)     on the Second Claim for Relief, declaring that plaintiff has not infringed any valid intellectual property rights owned by defendant;

(c)     on the Third Claim for Relief, declaring that plaintiff has not violated any rights belonging to defendant existing under state law;

13

(d)      on the Fourth, Fifth, and Sixth and Seventh Claims for Relief, awarding damages

to GC against defendant in an amount to be determined at trial, together with interest;

(e)      preliminarily and permanently enjoining defendant from interfering with GC's

business or sending threatening letters to GC's business partners;

(f)      awarding to GC attorneys' fees and all other costs of this action; and

(g)      awarding such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          October 1, 2013

                              FRIEDMAN & WITTENSTEIN
                              A Professional Corporation

                              By: _____
                                    Stuart I. Friedman
                                        sfriedman@friedmanwittenstein.com
                                    Andrew A. Wittenstein
                                        awittenstein@friedmanwittenstein.com
                                    Paul S. Grossman
                                        pgrossman@friedmanwittenstein.com
                                    Claire L. Chau
                                        cchau@friedmanwittenstein.com

                              600 Lexington Avenue
                              New York, New York 10022
                              (212) 750-8700


                              *Attorneys for Plaintiff*

14

# Exhibit A

`-1-2008  02:59A FROM:TAXE                3104715576          TO:17145442307        P.1

# CONTRACT FOR SALE OF ARTWORK WITH RESALE ROYALTY RIGHTS

AGREEMENT made as of the Second day of February, 1999, between ROBERT C. GUCCIONE (hereinafter referred to as the "Artist"), located at 16 East 67th Street, New York, N.Y. 10021, and DWARFCO PRODUCTIONS, INC. (hereinafter referred to as ("Dwarfco"), located at 10535 Vestone Way, Los Angeles, California 90077, with respect to the sale of certain original oil paintings and drawings (hereinafter referred to collectively as the ("Work").

WHEREAS, the Artist has created the Work and warrants that he has full right, title, and interest therein;

WHEREAS, the Artist wishes to sell the Work but to have a continuing relationship with the Work after its sale, including the right to maintain custody of the original Work, control its exhibition rights, and retain all rights to reproduce the Work, during his lifetime;

WHEREAS, Dwarfco has viewed and examined the Work and wishes to purchase it;

WHEREAS, the Artist wishes for his estate to receive a residual payment if the Work is resold after his death, that he acknowledged as the creator of the Work; and

WHEREAS, both parties wish to at all times maintain the integrity of the Work and prevent its destruction;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual obligations, covenants, and conditions hereinafter set forth, and other valuable considerations, the parties hereto agree as follows:

1. **Description of Work:** The Artist describes the Work as follows:

## ALL ORIGINAL OIL PAINTINGS AND DRAWINGS COMPLETED AND IN ARTIST'S POSSESSION PRIOR TO FEBRUARY, 1999.

2. **Sale:** The Artist hereby agrees to sell the Work to Dwarfco. Title shall pass to Dwarfco at such time as full payment is received by the Artist pursuant to Paragraph #4 hereof:

3. **Price:** Dwarfco agrees to purchase the Work for the agreed upon price of $500,000,00. Dwarfco has been made aware of the fact that Artist's original Work has not been sold and that the value placed upon them has no relationship to its present value if any. Dwarfco believes that the value of the Work will increase upon the death of the Artist.

4. **Payment:** Payment shall be made by Dwarfco concurrently with the execution of this Agreement by delivering precious and semi-precious cut and polished gemstones to the

: 1 2008  02:40A FROM: TAXE          3104715576          TO: 17145442307       P. 3

Artist that have been appraised in an amount in excess of $1,000,000.00 retail value. It is expressly understood and agreed to by the Artist that the actual cash value of the gemstones can only be determined by the amount of money a purchaser agrees to pay at some future date. The Artist shall provide Dwarfco with a Receipt stating that he has examined the gemstones and is satisfied with their quality and the value placed upon them by the Appraiser. The Artist warrants that he has had sufficient time to examine the gemstones and is satisfied with the retail value placed upon them by an Appraiser.

5. **Delivery:** Artist shall maintain custody of the Work until his death or may transfer possession to Dwarfco prior to his death if he so chooses. Upon Artist's death, Dwarfco shall arrange for delivery to a location of it choosing in California. The expenses of delivery (including, but not limited to, insurance and transportation) shall be paid by Dwarfco.

6. **Risk of Loss and Insurance:** The risk of loss or damage to an Original Work and the provision of any insurance to cover such loss or damage shall be the responsibility of Dwarfco from the time of delivery the Original Work to Dwarfco. Insurance in the minimum amount of $500,000.00 in favor of Dwarfco shall be the responsibility of the Artist prior to his death or, if he so chooses, delivery of the Work to Dwarfco while he is alive.

7. **Copyright and Reproduction:** The Artist reserves all reproduction rights, including the right to claim statutory copyright, of the Work. All approved reproductions shall bear the following copyright notice: © by Robert Guccione (Year__). Artist shall be entitled to all proceeds from sale or lease of reproductions of his Work, until his death or sooner if he chooses. In that event all reproduction rights will be automatically transferred to Dwarfco and the Artist or his estate will receive the sum of thirty percent (30%) of the gross sale proceeds to be paid quarterly.

8. **No Destruction:** Dwarfco  warrants that it shall not destroy, the Work or permit the Work to be destroyed without first offering to return ownership of the Work to the beneficiaries of his estate or their successors in interest.

9. **Integrity:** Dwarfco agrees that it shall not distort, mutilate, or otherwise alter the Work. In the event such distortion, mutilation, or other alteration occurs, whether by action of the Dwarfco or otherwise, the Artist or the beneficiaries of his estate, in addition to any other rights and remedies, have the right to have his name removed from the Work and no longer have it attributed to him as its creator, or to have a Receiver appointed to take custody of the Work so as to prevent  further waste, distortion, mutilation, or other alteration, with Dwarfco to be charged for the expenses of the Receiver and for the application to seeking to appoint  a Receiver.

10. **Attribution:** The Artist his heirs shall, at all times, have the right to have his name appear whenever his Works are displayed and to be acknowledged as its creator.

11. **Right to Exhibit:** The Artist may exhibit the work until Artist's death, provided that all Dwarfco not be held responsible for any expenses connected with the exhibit and

provided that all of the Work is insured against fire, theft, and damage in an amount of not ·
less than $1,000,000.00 with Dwarfco being the sole named beneficiary.

12. **Restoration:** In the event of damage to the Work requiring restoration or repair, the
Dwarfco authorizes the Artist to restore or repair the Work. In the event Artist declines his
opportunity to restore or repair the Work, Dwarfco shall consult with the Artist with respect
to the restoration or repairs. Any damage to the Work caused by Artist's negligence, prior
to his death may be recouped by Dwafrco by deducting payments for said repairs from
future resale royalties.

13. **Restriction on Resale:** Dwarfco agrees that it will not resell or transfer ownership of
the Work prior to the death of Artist without his written consent, which consent may be
withheld or conditioned by Artist upon any terms in his sole discretion.

14. **Resale Proceeds:** Dwarfco agrees to put forth its best efforts to realize the highest
possible price for the Work. Upon resale of the Work after Artist's death, Dwarfco agrees
to pay the Artist's estate thirty percent (30%) of the gross sale price received. If the Work
is transferred other than by sale (donation, exchange etc.) Dwarfco is to pay thirty percent
(30%) of the fair market value of the Work as of the date of transfer. Payments are to be
made within 14 days after they are received.

15. **The Parties Agree:** If during his lifetime the Artist is unable to insure the Work for an
amount equal to the purchase price, is unable to house the Work in safe and secure
surroundings or under any circumstances that would cause the Work to be lost, damaged or
destroyed, Dwarfco, at its sole discretion may demand that the Work to be transferred to a
secure California or another location where it will be safely stored and insured.

16. **Artist and Dwarfco Warrant:** This Agreement shall be binding upon the parties
hereto, their heirs, successors, assigns, and personal representatives. This Agreement
constitutes the entire understanding between the parties and can only be amended in
writing. Its terms can be modified only by an instrument in writing signed by both parties.
A waiver of any breach of any of the provisions of this Agreement shall not be construed as
a continuing waiver of other breaches of the same or other provisions hereof.   It is agreed
that this Agreement shall be governed by the laws of the State of California.

   IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date
first set forth above or as otherwise indicated below.

ARTIST

Date: February 2 , 1999

ROBERT C. GUCCIONE

DWARFCO PRODUCTIONS, INC.

Date: February 2 , 1999

RONALD TAXE, President

# RECEIPT FOR DELIVERY OF GEMSTONES

## Date: February 2, 1999

I Robert C. Guccione ("Artist") hereby accept delivery of 33 plastic boxes each containing cut and polished gemstones, described in attached Exhibit "A", as full payment under the terms of the attached CONTRACT FOR SALE OF ARTWORK WITH RESALE ROYALTY RIGHTS.   I have also received 33 Colored Stone Appraisal Certificates that contain original signatures signed by appraisers. I have examined the Gemstones and Appraisals and am satisfied that they meet my requirements.

I declare under the penalty of perjury under the laws of the State of California that the above information is true and correct.

_____

**ROBERT C. GUCCIONE**

_____

**Witness**

`: 2008  02:43A FROM: TAXE`          `3104715576`          `TO: 17145442307`          `P.6`

---

**STATE OF NEVADA**

**COUNTY OF CLARK**

}ss

On this __2ND__ day of __FEBRUARY__ , in the year 19 __99__, before me, the undersigned, a Notary Public in and for said State, personally appeared __ROBERT GUCCIONE__ _____ and _____ _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons who executed the within instrument.



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
GORDON DASKOWSKI
My Appointment Expires May 31, 1999

WITNESS my hand and official seal

_Gordon Daskowski_
Notary Public in and for said State

ACKNOWLEDGMENT — Corp — Pres & Sec — Wolcotts Form 222CA — LA — Rev 11-83
© 1983 WOLCOTTS, INC          form class 8-2]

# Exhibit B

Formatted

## AGREEMENT AND STIPULATION

This Agreement (the "Agreement") is made among chapter 7 debtor Robert C. Guccione, Sr. ("Guccione"), Robert Gans and Metropolitan Building and Lumber, Inc. (collectively, "Gans"), James Sell, as receiver for Secura Mortgage Management, L.L.C., and its substantively consolidated related debtor entities ("Sell"), Gary S. Jacobson in his capacity as Chapter 7 Trustee (the "Trustee") of Guccione's bankruptcy estate, Dwarfco Productions, Inc. ("Dwarfco"), April Warren a/k/a April Guccione ("Warren"), and Richard Taxe ("Taxe") (collectively, the "Settling Parties"),

### THE DEBTOR AND THE BANKRUPTCY CASE

WHEREAS, Guccione is the title owner of, the real property commonly known as 14 Johnson Avenue in Englewood Cliffs, New Jersey (the "House"); and

WHEREAS, Guccione filed a petition for relief under chapter 7 of the Bankruptcy Code on August 14, 2008, which commenced the bankruptcy case captioned *In re Guccione*, No. 08-25393 (MS) (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"); and

WHEREAS, the Trustee was appointed as the chapter 7 trustee for Guccione's bankruptcy estate on August 15, 2008; and

### THE ADVERSARY PROCEEDINGS

WHEREAS, Guccione filed an adversary proceeding in the Bankruptcy Court on September 17, 2008, with the caption *Guccione v. Sell, et al.*, No. 08-02265 (MS) (the "Guccione Adversary Proceeding"), which remains pending as of the date of this Agreement; and

WHEREAS, Dwarfco filed an adversary proceeding in the Bankruptcy Court on December 5, 2008, with the caption *Dwarfco Productions, Inc. v. Sell, et al.*, No. 08-02958 (MS)



(the "Dwarfco Adversary Proceeding"), which remains pending as of the date of this Agreement;

and

WHEREAS, the Trustee filed an adversary proceeding in the Bankruptcy Court on

March 3, 2009, with the caption *Jacobson v. Metropolitan Building & Lumber, Inc., et al.*, No.

09-01338 (MS) (the "First Trustee Adversary Proceeding"); and

WHEREAS, the Trustee filed an adversary proceeding in the Bankruptcy Court on July

9, 2009, with the caption *Jacobson v. Sotheby's Inc., et al.*, No. 09-02019 (MS) (the "Second

Trustee Adversary Proceeding");

WHEREAS, the Trustee filed an action in the Supreme Court of New York, County of

New York, with the caption *Gary Jacobson, Chapter 7 Trustee for the Estate of Robert C.*

*Guccione v. Jay M. Newman and Newman and Newman, P.C.*, Index No. 110697/08 ("Newman

Proceeding"); and

WHEREAS, the Guccione Adversary Proceeding, the Dwarfco Adversary Proceeding,

the First Trustee Adversary Proceeding, the Second Trustee Adversary Proceeding, and the

Newman Proceeding shall hereinafter be collectively referred to as the "Adversary Proceedings,"

and

## GANS JUDGMENT

WHEREAS, in a special proceeding captioned *Metropolitan Lumber, Hardware &*

*Building Supplies, Inc., and Robert Gans, Plaintiffs, v. Robert C. Guccione, Defendant*, Supreme

Court, New York County, Index No. 113632/03, Gans obtained a judgment in the amount of

$1,862,972.26, plus interest, against Guccione in favor of Gans (the "Gans Judgment") and an

affidavit of confession of judgment executed by Guccione. The Gans Judgment was docketed in

the New York County Clerk's Office on July 28, 2003; and

2

WHEREAS, Gans commenced an action on October 31, 2007, in the Supreme Court, New York County, captioned *Application of Metropolitan Lumber, Hardware & Building Supplies, Inc., and Robert Gans, Petitioners, v. Marc H. Bell, Daniel C. Staton, Penthouse Media Group, Inc., Charles Samel, Jason Galanis, Dr. Luis Enrique Molina Galeana a/k/a Fernando Molina, Internet Billing Company, LLC, and Penthouse International, Inc., Respondents*, Index No. 116610/06, seeking relief pursuant to CPLR §§ 5525(b), 5527, or both (the "Enforcement Action"); and

WHEREAS, Gans commenced the Enforcement Action after learning that certain individuals and entities, namely Marc H. Bell, Daniel C. Staton, Penthouse Media Group, Inc., Charles Samel, Jason Galanis, Dr. Luis Enrique Molina Galeana a/k/a Fernando Molina, Internet Billing Company, LLC, and Penthouse International, Inc. (collectively, the "Bell Defendants"), potentially owed Guccione in excess of the Gans Judgment and accrued interest amount, as evidenced by the Complaint in the action captioned *Robert C. Guccione, Plaintiff, v. Marc H. Bell, et al., Defendants*, Supreme Court, New York County, Index No. 604465/05 (the "Bell Action"); and

WHEREAS, on February 7, 2007, the Hon. Eileen A. Rakower, issued a decision and order in the Enforcement Action requiring the Bell Defendants to turn over to Gans any payment they become obligated pursuant to a settlement or judgment of the Guccione Action in an amount sufficient to satisfy the Judgment and all accrued interest through the date of such payment ("Rakower Order"); and

3

RECEIVED TIME NOV. 2. 10:24AM

Case 03-02653-MS-06094-CG   Doc 11-04/09   Entered 11/04/09 Page 25 of 44   Desc
Settlement Agreement & Stipulation    Page 4 of 15

## SECURA JUDGMENT AND EXECUTION THEREOF

WHEREAS, Sell obtained a judgment in Arizona state court on July 20, 2005, in the amount of $22,760,987.10, with interest, against General Media International, Inc. ("GMII"), and Guccione (the "Secura Judgment"); and

WHEREAS, Sell domesticated the Secura Judgment in the Supreme Court of the State of New York, New York County, Index No. 113055/06, and the New York court appointed Franz Leichter as Receiver for Sell in the State of New York in connection with the Secura Judgment; and

WHEREAS, Sell domesticated the Secura Judgment in New Jersey on February 14, 2007, Docket No. 113055/06, and docketed in the Office of the Clerk of the Superior Court of New Jersey on March 12, 2007; and

WHEREAS, on April 17, 2007, Sell directed a Writ of Execution to the Sheriff of the County of Hudson, New Jersey (the "Sheriff") and on May 11, 2007, the Sheriff levied on all of the personal property of Guccione located within the State of New Jersey including but not limited to items contained/stored in Jersey City, New Jersey, at locations controlled and/or operated by: Moishes; Moishes Movers; Moishes of Chicago; Mana Fine Arts; Guarantee Asset Management; or Guarantee Storage Centers, (collectively, the "Moishe's Facility"). On June 26, 2008, the Sheriff conducted a sale of all property located in the Moishes Facility (the "Execution Sale"), and Sell was the successful bidder at the sale and purchaser of all items in the Storage Facility; and

WHEREAS, Sell has sent restraining notices to the following other storage facilities (where, upon information and belief, there may be property of value that belongs to Guccione's bankruptcy estate): facility owned by the Robert Lewis Group, L.L.C., at 438 West 51st Street,

4

New York, New York; facility owned by an entity doing business under the name(s) Guarantee

Asset Management and/or Guarantee Storage Centers, at 449 West 14th Street, New York, New

York; facilities owned by an entity doing business under the name CitiStorage at 421 7th Avenue,

New York, New York, and 5 North 11th Street, Brooklyn, New York; and the facility owned by

Wally Findlay Galleries, Inc., at 124 East 57th Street, New York, New York (the "New York

Storage Facilities").  The New York Storage Facilities, together with the Moishe's Facility, shall

hereinafter be collectively referred to as the "Storage Facilities";

NOW, THEREFORE, the Settling Parties hereby agree as follows:

1.    Sell hereby releases Guccione, GMII, Warren, and their respective successors and

assigns from any and all further liability in connection with the Secura Judgment.  Sell hereby

agrees to take any and all necessary steps to ensure that any and all actions in connection with

enforcement of the Secura Judgment are terminated.  Further, Sell hereby releases  and agrees to

defend, indemnify, and hold harmless the Trustee for all attorney's fees, costs and disbursements

claimed to be due and owing by the law firm McLaughlin & Stern, LLP, including, but not

limited to, attorney's fees, costs and disbursements McLaughlin & Stern, LLP, claims it is owed

by Sell.

2.    Gans hereby releases Guccione, GMII, and their respective successors and assigns

from any and all further liability in connection with the Gans Judgment.  Gans hereby agrees to

take any and all necessary steps to ensure that any and all pending actions in connection with

enforcement of the Gans Judgment are terminated.  Nothing herein shall affect the validity of the

Claim Assignment (as defined in paragraph 11) or the Rakower Order.

5

Deleted: and Christie's [is there anything there?]

3.     Guccione and the Trustee authorize Sotheby's to release to Sell any funds that they have that are held in Guccione's name and agree to stipulate to this Court's entry of an order requiring the immediate turnover of these funds.

4.     Guccione, Warren, Dwarfco, Taxe, and the Trustee release Sell, and his successors and assigns, from any liability that has or could have been asserted against Sell, including but not limited to any potential causes of action relating to any collection efforts on behalf of Secura, and any potential liability under Chapter 5 of the United States Bankruptcy Code.

Deleted: .

5.     The Trustee agrees to allow Taxe, or his nominee or assign, the option to purchase free and clear of all liens and encumbrances other than the now-existing mortgage on the House and close (the "Closing") on the House for a total of $800,000.00, comprised of cash and assumption of the now-existing mortgage on the House (the "Option"). Sell shall be entitled to the Net Cash Proceeds from the purchase. Net Cash Proceeds shall be defined as the cash proceeds that exist after deducting the mortgage, property taxes due and the usual and customary costs of closing from the $800,000.00 purchase price. The Net Cash Proceeds shall be paid directly to Sell.

Deleted: with prejudice

6.     This Option will extend for one hundred and twenty (120) days after the date of an Approved Settlement (as defined in paragraph 33) (the "Option Period"). This Bankruptcy Case shall be dismissed within ten (10) days of the Closing. Guccione agrees not to file another petition for relief under the Bankruptcy Code for three (3) years from the date of dismissal of this Bankruptcy Case.

6

7.     The Trustee agrees to allow Guccione and any member of his immediate family to occupy the House during the Option Period, provided that Taxe and/or Guccione pay all monthly costs associated with the House, including but not limited to: mortgage; taxes; insurance; security and maintenance, as due and be maintained at the levels currently in place in this Bankruptcy Case. Any failure by Taxe and/or Guccione to make any of the aforementioned payments or to otherwise maintain the *status quo* of the House will result in his immediate surrender of any rights to occupy the House and the immediate termination of the Option and Option Period, at which point the house will be sold pursuant to Paragraph 10 below.

8.     Taxe and Guccione acknowledge and agree that nothing herein creates any tenancy rights in the House.

9.     Guccione agrees to vacate the House within ten (10) days of the earlier of the termination of the Option Period or the Closing.

10.     Upon the Termination of the Option Period due to either Taxe's failure to comply with this Agreement, or expiration of the Option Period without Closing, the Trustee may proceed to market and sell the House through the Bankruptcy Estate subject to his statutory commission on the proceeds from the sale of the house and attorney's fees incurred subsequent to the termination of the Option Period that arise in connection with the sale of the house and fees. The Net Cash Proceeds of a sale by the Trustee will be paid to Sell.

11.     Within ten (10) days of the Approved Settlement, Trustee shall abandon and assign to Robert Gans, without representation or warranty, all of the Guccione Estate's rights and interests in the Bell Action, including but not limited to all rights to the $200,000 the Trustee currently holds in escrow in connection with the Bell Action, pursuant to Sections 554 and 363

Deleted: .

Deleted: n

Deleted: p

RECEIVED TIME NOV. 2. 10:24AM

**Deleted:** and on account of the Rakower Order.

of the Bankruptcy Code ("Estate's Assignment"), Guccione, Penthouse Publications Limited,
and GMII assign to Robert Gans, without representation or warranty, all of their rights and
interests in the Bell Action, including but not limited to any rights to the $200,000 currently held
in escrow by the Trustee in connection with the Bell Action (collectively with the Estate's
Assignment, herein referred to as the "Claim Assignment").

**Deleted:** Any proceeds recovered in the Bell Action that are in excess of the amount of the Gans Judgment shall be turned over to Guccione.

12.    Within ten (10) days of the Approved Settlement and receipt of payment in
accordance with Paragraph 16 below. **Trustee shall turn over the sum of $200,000 – that he
currently holds in escrow in connection with the Bell Action – to the attorney trust account of
Pryor Cashman, L.L.P.; to be held pending resolution of the Bell Action and a determination of
ownership of the $200,000 in the Bell Action.**

**Deleted:**

**Deleted:** Trenk, DiPasquale, Webster, Della Fera & Sodono, P.C

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Normal, Line spacing: Double

13.    Within ten (10) days of the Approved Settlement the balance from the $21,182.53
originally received by Trustee from Franz Leichter as court appointed receiver for Sell remaining
after payment of Leichter's commissions and expenses on account of attorney's fees McLaughlin
and Stern, LLP incurred as counsel to Leichter shall be turned over by Trustee to McLaughlin &
Stern, LLP.

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Indent: First line: 0.5", No bullets or numbering, Don't keep lines together

**Deleted:** through its fruition

14.    Gans, being represented by Pryor Cashman, L.L.P. ("Pryor Cashman"), shall
settle or continue to prosecute the Bell Action. While Gans will seek the maximum recovery he
believes he can obtain in light of the strengths and weaknesses of the claims, Gans will owe no
duty (fiduciary or otherwise) to any of the Plaintiffs in the Bell Action and shall have absolute
authority to settle the Bell Action on whatever terms he feels are appropriate. Guccione agrees
to cooperate in a good faith manner in the prosecution of the Bell Action. Guccione shall be
entitled to ten percent (10%) of any amounts recovered by Gans in the Bell Action after
deduction of $75,000.00, Pryor Cashman's disbursements, and Pryor Cashman's contingency fee

8

from the amount recovered. Guccione agrees that his counsel shall receive _____ percent
(__%) of the amount of his recovery from the Bell Action.

15.    All personal papers, wearing apparel, religious books, family photographs, and
family videos, with the exception of items having extraordinary value shall be returned to
Guccione and/or Warren.  The terms and conditions set forth in the Courts Order dated March
11, 2009 are specifically set forth herein as if fully incorporated.  All other items in the Moishes
Facility are released and turned over to Sell, and Sell agrees to pay and otherwise satisfy any and
all outstanding fees sought by the Moishes Facilities..  All remaining items in the New York
Storage Facilities are to be released and turned over to Sell, at his option, after his review of the
contents of the facilities; however, all personal papers, wearing apparel, religious books, family
photographs and family videos shall be returned to Guccione and/or Warren.  If Sell exercises
his right to possession over any of the items in the New York Storage Facilities, Sell agrees to
pay and otherwise satisfy his proportionate share of the outstanding fees sought by such facility.
All remaining expenses of the Storage Facilities are the responsibility of Guccione if he decides
to remove items from such Storage Facilities.

16.    Sell and Gans shall pay the fees that the Trustee incurred in administering
Guccione's estate, which are in the amount of $150,000.00 — with Sell and Gans each paying
$75,000.00.  Except as provided in Paragraph 10 above, the Trustee shall waive any and all fees,
commissions, and expense-reimbursements above that amount.  The Parties stipulate and agree
that this amount shall be paid to the Trustee no later than December 1, 2009.  Failure to make
payment by December 1, 2009, shall void this Agreement and Stipulation.

17.    Dwarfco shall reimburse Sell for seventy (70) percent of the total outstanding fees
paid by him to the Moishes Facility relating to the storage of original oil paintings and drawings

9

Deleted: .
Deleted: that have little or no value as determined by Sell in his sole discretion, shall be returned to Guccione
Deleted: .
Deleted: T
Deleted: may
Deleted: 5

authored by Guccione (the "Artwork") and described in that certain Contract for Sale of Artwork with Resale Royalty Rights, dated February 2, 1999, between Guccione and Dwarfco, within the earlier of: thirty (30) days from the date Sell pays the portion of such fees which remain outstanding; or the date Dwarfco takes possession of the Artwork. After such reimbursement to Sell, Dwarfco shall take possession of the Artwork free and clear of any and all liens, claims, and encumbrances, including but not limited to liens and claims-for-payment asserted by any of the Storage Facilities. If Dwarfco fails to reimburse Sell as described above, Sell shall take possession and ownership of the Artwork, free and clear of any and all liens, claims, and encumbrances, including but not limited to any claims by Dwarfco.

18.    The Settling Parties agree to release the Artwork to Guccione upon entry of an order authorizing the Approved Settlement. Dwarfco and or Taxie agree to pay all outstanding storage charges, shipping fees, and other related charges for the return of the Artwork to Guccione. Upon Guccione's passing, Dwarfco agrees to exercise its best efforts to market, sell, license, and/or display the Artwork. Although Dwarfco agrees to allow Guccione to remain in possession of the Artwork, Dwarfco still retains ownership under its prior agreement with Guccione. Dwarfco agrees that any proceeds derived from the Artwork, whether through sale, license, or other means, shall be shared as follows: 70% of the gross proceeds to Dwarfco, 15% of the gross proceeds to Sell, and 15% of the gross proceeds to April Guccione (a/k/a April Warren). Dwarfco shall provide Sell and Warren with quarterly reports detailing its efforts to market the Artwork, and provide a quarterly accounting of any proceeds and costs associated with the Artwork, on or before the 15th day of the month following such quarter. Dwarfco shall remit Sell and Warren's share of any such proceeds received during any calendar quarter, to each of them, on or before the 15th day of the month following the close of such quarter.

10

**Deleted:** s

19.    Guccione represents and warrants that he is not presently aware of any other assets that he owns that he has not already disclosed to the other Settling Parties. 20.    The time within which Sell and/or Trustee may commence an action objecting to Guccione's Chapter 7 discharge is hereby extended through the date of the Approved Settlement, without the necessity for separate orders to that effect.

Deleted: ¶

21.    Each of the Settling Parties represents and warrants to the others that it has not assigned or transferred or purported to assign or transfer to any person, firm, corporation, or entity any claim, demand, right, damage, liability, debt, account, action, cause of action, or any other matter released in this Agreement.

22.    The covenants, representations, warranties and acknowledgements in this Agreement shall survive the execution and performance of the Agreement.

Deleted: ¶

23.    This Agreement, and all covenants set forth herein, shall be binding upon and shall inure to the benefit of the respective parties, their agents, servants, employees, successors, predecessors, heirs, executors, administrators, trustees, members, affiliated and related entities, officers, directors, representatives, attorneys, insurers, and assigns, whether known or unknown. This Agreement shall be construed in accordance with, and be deemed governed by Title 11 of the United States Code and, the laws of the State of New Jersey, without regard to conflict of law principles.

24.    The parties represent and warrant and acknowledge to each other that each has read this Agreement; that each fully understands its rights, privileges and duties under this Agreement; and that each enters into this Agreement freely and voluntarily. Each party further acknowledges that each has had the opportunity to consult with an attorney of its choice to

explain the terms of this Agreement and all matters covered by and relating to it, and the consequences of signing it.

25.    The undersigned each acknowledge and represent that no promise or representation not contained in this Agreement, or in any exhibit, has been made to them, and that this Agreement contains the entire understanding and agreement between the parties and it contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced in the Agreement.

26.    This Agreement and the provisions contained in this Agreement shall not be construed or interpreted for or against any party because that party drafted or caused the party's legal representative to draft any of the provisions.

27.    This Agreement cannot be modified or amended in any way, except in writing, signed by all parties.

28.    If any provision of this Agreement or the application of this Agreement to any party or circumstance is held by judicial authority to be invalid, the application of such provision to the other party or other circumstances and the remainder of the Agreement shall remain in full force and shall not be affected thereby, unless such holding materially changes the terms of the Agreement.

29.    To the extent that any prior court order shall be required to be modified to allow for the implementation of this agreement, the parties agree to cooperate to obtain the necessary relief on an expedited basis.

30.    To the extent that any further documents need be executed to comply with the provisions of this Agreement, the Parties agree to cooperate and to use their best efforts to execute such documents.

12

31.    This Agreement does not constitute an offer and is not valid and binding until fully executed by all parties hereto.

32.    This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, and such counterparts shall together constitute one and the same agreement.

33.    This Agreement shall be binding on the parties from the date of its execution, but is expressly subject to and contingent upon the issuance of a Notice of Proposed Settlement of Controversy ("Settlement Notice") by the Bankruptcy Court, as to which Settlement Notice no timely objection is interposed, or any objection that is filed is overruled or denied by entry of a final, nonappealable order of the Bankruptcy Court ("Approved Settlement"). The Adversary Proceedings shall be dismissed with prejudice within ten (10) days of the Approved Settlement.

34.    The Trustee may obtain an order dismissing the Bankruptcy Case without further general notice to creditors by submitting a proposed order of dismissal with his certification that all conditions established by this Agreement and Stipulation have been satisfied, on notice to the Settling Parties pursuant to Local Bankruptcy Rule 9072-2.

35.    If the Settlement Notice does not result in an Approved Settlement, this Agreement shall be null and void.

Dated October _____, 2009

| | |
|---|---|
| Dennis T. Kearney<br>DAY PITNEY<br>200 Campus Drive<br>Florham Park, NJ 07932<br>Tel: (973) 966-8039<br>Fax: (973) 966-1015 | Brian Hofmeister<br>TEICH GROH<br>691 State Highway 33<br>Trenton, NJ 08619<br>Tel: (609) 890-1500<br>Fax: (609) 890-6961 |

Deleted: 1
Deleted: 2
Deleted: 4
Formatted Table

_____
Attorneys for James C. Sell, Receiver
and Secura Mortgage Management, LLC

_____
Attorneys for Dwarfco Productions, Inc.

Gary S. Jacobson
HEROLD LAW P.A.
25 Independence Blvd.
Warren, NJ 07059
Tel: (908) 647-1022
Fax: (908) 647-7721

Noah Weissman
Bryan Cave
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 541-2028
Fax: (212) 541-1428

Deleted: A
Deleted: HAINES

_____
Trustee

_____
Attorneys for Gans and Metropolitan
Lumber, Hardware and Building
Supplies, Inc.

Richard Taxe
10535 Vestone Way
Los Angeles, CA 90077
Tel: (310) 476-2195
taxe63@gmail.com

Anthony Sodono
TRENK, DIPASQUALE, WEBSTER,
DELLA FERA & SODONO, P.C.
347 Mt. Pleasant Ave., Ste. 300
West Orange, NJ 07052
Tel: (973) 243-8600
Fax: (973) 243-8677

Deleted: 00
Formatted: Underline

_____
Richard Taxe

_____
Attorneys for Robert C. Guccione

Formatted: Keep with next, Keep
lines together

April Warren
14 Johnson Ave.
Englewood Cliffs, NJ

Robert C. Guccione, Sr.
14 Johnson Ave.
Englewood Cliffs, NJ

_____
April Warren

_____
Robert C. Guccione, Sr.

Formatted: Font color: Red
Formatted: Underline, Font color:
Red
Deleted: By Richard Taxe through¶
Power of Attorney

14

Dated this day
11-01-09 in the County of
Collin, state of Texas.



CYNTHIA L. PAULSON
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP 1-13-2010

Formatted: Font: 7 pt

15

# Exhibit C



# PRYOR CASHMAN LLP

New York | Los Angeles

7 Times Square, New York, NY 10036-6569  Tel: 212-421-4100  Fax: 212-326-0806

www.pryorcashman.com

**Jamie M. Brickell**

Direct Tel: 212-326-0869
Direct Fax: 212-798-6363
jbrickell@pryorcashman.com

September 11, 2013

**VIA E-MAIL**

Mr. Jeremy Frommer
c/o Marc A. Lebowitz, Esq.
Lebowitz Law Office, LLC
777 Third Avenue, 35th Floor
New York, NY 10017

Re:   **Estate of Robert Guccione, Sr.**

Dear Mr. Frommer:

As you may recall, I wrote to your counsel, Marc Lebowitz, on behalf of the estate of Robert Guccione, Sr. (the "Guccione Estate"), on June 26, 2013, to address issues raised by your efforts to commercialize matters relevant to the Guccione Estate. At the time, I had advised Mr. Lebowitz, after reviewing certain materials that he had made available to us, that the Guccione Estate would be entitled to 30% of the gross receipts from your sales, but also that it was unclear whether you even had the right to sell such items. Since that time, you have not provided us with any explanation as to why you believe you have the right to engage in any activity other than, perhaps, simply selling the individual items you purchased from a variety of sources.

At this point, the Guccione Estate may be willing to talk to you further, and it remains hopeful that a deal of some kind can be arranged. However, we feel compelled to once again put you on formal notice that your physical ownership of photographs, magazines, cards, film, memorabilia, art, etc. does **not** give you the right to reproduce such items, as the copyrights and trademarks to such titles, items, magazines, art, cards, film and photographs are owned by others, including the Guccione Estate.

We therefore demand that you immediately cease and desist from all activities that impact on the rights of the Guccione Estate. We also hereby demand a full and accurate accounting of all items sold by you that impacts on those rights. Once the Guccione Estate is provided with a full breakdown of all that you have done to date, and all monies received by you as a result of those activities, it will be in position to determine whether a deal can be negotiated, or whether this matter can only be resolved through litigation.

1263727

# ∎ PRYOR CASHMAN LLP

Mr. Jeremy Frommer
c/o Marc A. Lebowitz, Esq.
September 11, 2013
Page 2

By way of example, it has come to our attention that, without the Guccione Estate's authorization, you have approached Powerhouse about publishing a book containing art from Omni Magazine. As you are aware, the copyright to Omni Magazine is owned by the Guccione Estate, and each magazine contains a copyright notice of "all rights reserved," followed by a warning that "[r]eproduction in whole or in part without permission is prohibited." Moreover, the Omni trademark is not owned by you nor can it be reproduced by you without the prior written consent of the trademark owner.

Additionally, the Guccione Estate has been informed that, without its authorization, you intend to publish a coffee table book containing photo layouts owned by the Guccione Estate, and that you have also approached Simon Limpkin about reprinting greeting cards and other items owned by the Guccione Estate without its permission.

The Guccione Estate has also been informed that you are using Mr. Guccione's name and likeness on a website for trade or advertising purposes, and have been merchandising many items on such website. Such publication and merchandising has been undertaken without any authorization or consent of the Guccione Estate, in violation of its right of publicity and other state and federal protectable rights in the Guccione name and likeness, including (without limitation) "passing off" and a violation under the Lanham Act, causing confusion in the marketplace, and denigrating and demeaning the good name and character of Mr. Guccione.

In light of the above, the Guccione Estate, on its own behalf and on behalf of its heirs, hereby demands that you cease and desist from the production, reproduction, publication, manufacture, distribution and/or sale of merchandise, books, films, magazines and other items containing the name and/or likeness of Bob Guccione and/or photographs, artwork, magazines, cards or other items owned by the Guccione Estate and/or heirs of the Guccione Estate.

We ask that you contact the undersigned within 48 hours of your receipt of this letter regarding your intentions in this matter. Your failure to do so will leave us with no alternative other than to seek legal relief.

The foregoing shall not be deemed a complete recitation of all of the facts in this matter and nothing herein contained or omitted shall be deemed a waiver of any of my client's rights and remedies at law and in equity, all of which rights are hereby specifically reserved.

Yours truly,

Jamie M. Brickell

1263727

# Exhibit D



# PRYOR CASHMAN LLP

New York | Los Angeles

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806          www.pryorcashman.com

**Jamie M. Brickell**
Partner
Direct Tel:  212-326-0869
Direct Fax:  212-798-6363
jbrickell@pryorcashman.com

September 25, 2013

**VIA FEDERAL EXPRESS**

Jonathan Lutzky, Esq.
General Counsel
VICE Media, Inc.
97 North 10th Street Suite 204
Brooklyn, New York 11211

Re: **Infringement of Rights By Vice "The Guccione Archives Issue"**

Dear Mr. Lutzky:

We represent the Estate of Robert Guccione, Sr. (the "Guccione Estate"), and write concerning the blatant and egregious infringement by VICE Media, Inc. ("Vice") of numerous intellectual property and publicity rights owned by the Guccione Estate.

We have reviewed the September 2013 issue of Vice Magazine (Volume 20, Number 9), also titled "The Guccione Archives Issue," as well as pages with similar content on the Vice.com website (together, the "Vice Guccione Material").  The Vice Guccione Material violates our client's rights in numerous instances.   Furthermore, these instances are unmistakable and represent the worst sort of willful infringement.   Among the copyrighted content that was illegally copied and distributed by Vice are pages from the Autobiography of Robert Guccione, Sr. and numerous photographs and paintings created by Mr. Guccione.  It is inconceivable to us that Vice – a media company – could possibly think that just because it had physical possession of a book, photograph or painting that it had the right to reproduce and distribute copies of that work to the public.

The Vice Guccione Material further contains troubling violations of the right of publicity of Mr. Guccione owned by the Estate.   Vice uses Mr. Guccione's name, likeness and even signature to falsely imply a connection between Vice's products and services and Mr. Guccione. These uses go beyond anything journalistic and create a false commercial connection between

# PRYOR CASHMAN LLP

Jonathan Lutzky
General Counsel
VICE Media, Inc.
September 25, 2013
Page 2

Vice and Mr. Guccione for Vice's commercial benefit and to the detriment of the Estate's rights. Nor are these infringements insubstantial. The entire Vice Guccione Material is devoted to Mr. Guccione and much of it to content created by him and owned by the Estate.

Vice's conduct has irreparably harmed our client's interests, and these acts and the violation of these rights are taken very seriously. Please be advised that Vice's continued display and publication of infringing  content following receipt of this letter will further demonstrate its willful infringement. Given the compelling evidence of the infringement, we demand that you immediately cease and desist from any further display or publication of the Vice Guccione Material, including but not limited to all writings, photographs, paintings and other content created by Mr. Guccione. We also demand that Vice immediately cease and desist from disseminating any other content to the public that creates a false connection between Vice and Mr. Guccione's name, likeness or persona.

Please be advised that we also take very seriously Vice's obligations to preserve evidence concerning this dispute, and will vigorously pursue all documents material to these matters. Specifically, be advised that Vice has an obligation to preserve all documents, tangible things and electronically stored information potentially responsive to any issues in the above described dispute, and we hereby demand that such preservation occur and continue.

Please confirm to us by no later than September 30, 2013 that you will comply with this demand. Failing to hear from you by this deadline, we will assume that you intend to continue willful infringing activity and do not wish to amicably resolve this dispute, and reserve all rights to proceed accordingly with no further notice.

This letter is sent without prejudice to our client's rights and remedies at law or in equity, all of which are expressly reserved.

Very truly yours,

Jamie M. Brickell

# Exhibit E



# PRYOR CASHMAN LLP

New York | Los Angeles

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806

www.pryorcashman.com

September 25, 2013

**VIA FEDERAL EXPRESS**

Mr. Craig Cohen
Executive Publisher
powerHouse Books
37 Main Street
Brooklyn, NY 11201

       **Re: <u>Infringement of Guccione Estate Copyrights</u>**

Dear Mr. Cohen:

       We represent the Estate of Robert Guccione, Sr. (the "Guccione Estate"), and write concerning potential infringement of intellectual property rights owned by the Guccione Estate.

       We have seen reports in the media that powerHouse Books may be intending to release a book containing artwork and photographs created by Mr. Guccione. Please be aware that the Guccione Estate owns the copyrights to this artwork and photography, and that reproduction of these materials without permission of the Guccione Estate may be prohibited by copyright laws and may subject powerHouse to damages and injunctive relief.

       Please contact us immediately to discuss powerHouse's plans in this regard. If powerHouse proceeds with the publication of infringing material, the Guccione Estate reserves all rights to pursue its claims at law and in equity with no further notice.

                   Very truly yours,

                   Jamie M. Brickell